## WILSON *v.* COON and others.

*(Circuit Court, S. D. New York. December 28, 1880.)*

1. **"SPECIFICATION."**

    The word "specification," as employed in the patent laws, when used without the word "claim," means description and claim.

2. **SAME—RE-ISSUE.**

    Hence, under section 4916 of the Revised Statutes, a re-issue is allowed when the specification is defective or insufficient, in regard to either the description or the claim, or to both, to such an extent as to render the patent inoperative or invalid, if the error arose in the manner mentioned in the statute.

3. **SAME—SAME.**

    If a patentee, in the description and claim in his original patent, erroneously set forth something short of his real invention, it is a proper case for a re-issue, although his real invention may be fully shown in the drawings and model.

4. RE-ISSUE ON VALID PATENT.

A re-issue is not invalid merely because the claim of the original patent was valid, and suit could be sustained thereon.

5. NOVELTY—SIMILARITY IN SHAPE.

Similarity in shape does not establish anticipation, if the two inventions are different as mechanical structures.

In Equity.

*Marsh & Wallis*, for plaintiff.

*S. F. Kneeland*, for defendants.

BLATCHFORD, C. J.   This suit is founded on re-issued letters patent No. 8,169, granted to the plaintiff, as inventor, April 9, 1878, for an "improvement in collars," the original patent, No. 197,807, having been granted to him December 4, 1877. The drawings of the original and the re-issue are the same. The specification of the re-issue, reading what is within and what is outside of brackets and not what is *underscored*, is as follows : "In the accompanying drawings, figure 1 represents a side elevation of my improved collar, and figure 2 a perspective view of the same.   Similar letters of reference indicate corresponding parts.   This invention refers to an improved standing collar, that retains all the advantages of the old style curved band, without the objection of springing the collar too far from the neck, so as to come in contact with the coat and soil the collar.   The collar also hugs the neck band in such a manner that the collar is prevented from overriding it, resulting in a more comfortable fit.   The invention consists of a standing [or other] collar having *sectional* [curved and graduated] bands [that extend along the lower edge of the] *starting from center of* collar, or [from] any other point between center and ends, *and continuing with a graduated curve* to and beyond the ends of the collar.   Referring to the drawings, A represents a standing [or other] collar of my improved construction, and B the [curved and graduated] *short or sectional* bands, which [extend] *start* from the center of [the] collar, or any other point between the center and ends, and continue along the lower part of the [top or body of the collar] *same* with a graduated curve and increasing width, to and beyond the ends of the collar, [the ends being

curved,] in the same manner as ordinary bands. The bands, B, are made either to overlap the collar proper, or the collar is made to overlap the bands, or one part of the bands laps over the collar ends, while the remaining part is overlapped by the collar, so as to obtain smoothly-covered joints at both meeting ends of collar and [graduated] *sectional* bands. The bead [or binding] formed by the connection of collar and band may also be continued, if desired, along the lower edge of that part of the collar [body] between the bands [so as to connect the graduated bands] and [impart] thereby a more ornamental appearance *imparted* to the [collar] *same.* [The rear button-hole, *a,* is arranged in the top or body of the collar above the bead or binding at the lower edge of the same, which position of the button-hole, in connection with the graduated bands, produces] *The use of the short or sectional bands produces a saving of material, as compared to the old style of continuous band, and furnishes a* collar that hugs the neck band in superior manner, without springing back so as to come in contact with the [coat] collar. [The shorter graduated bands produce also a considerable saving of material as compared to the old style of continuous band that extends at uniform width along the lower part of the collar.] " Reading in the foregoing what is outside of brackets, including what is *underscored,* and omitting what is within brackets, makes the specification of the original patent.

There are four claims in the re-issue, as follows: "*First,* a collar provided with a band composed of the parts B, B, curved, and tapered or decreasingly graduated from the ends towards the middle, as shown and described; *second,* a collar having short or sectional bands starting from the center of the collar, or any point between the center and ends thereof, and continuing with a graduated curve to and beyond the ends of the same, substantially as and for the purpose set forth; *third,* the combination with a collar having short bands, graduated on a curve and decreasingly towards the middle, of a band-connecting bead or binding along the lower edge, as set forth; *fourth,* a collar having curved

and graduated bands that extend along the top or body of the collar from the center, or any other point between the center and ends thereof, to and beyond the ends of the collar, and having the rear button-hole placed above the band or binding into the top or body of the collar, substantially as shown and described."

The claim of the original patent was as follows: "A collar, A, having sectional bands, B, starting from the center of the collar, or any point between the center and ends thereof, and continuing with a graduated curve to and beyond the ends of the same, substantially as described and shown, and for the purpose set forth."

It is contended for the defendants that the re-issued patent is void because the original patent was valid and operative, and because it contains new matter, and entirely changes the character of invention set forth in the original patent, and because the re-issued patent was intended to cover a different collar from that originally invented. This re-issue was granted uuder section 4916 of the Revised Statutes, which provides as follows: "Whenever any patent is inoperative or invalid, by reason of a defective or insufficient specification, or by reason of the patentee claiming, as his own invention or discovery, more than he had a right to claim as new, if the error has arisen by inadvertence, accident, or mistake, and without any fraudulent or deceptive intention, the commissioner shall, on the surrender of such patent, and the payment of the duty required by law, cause a new patent for the same invention, and in accordance with the corrected specification, to be issued. * * * The specifications and claim in every such case shall be subject to revision and restriction in the same manner as original applications are. Every patent so re-issued, together with the corrected specification, shall have the same effect and operation in law, on the trial of all actions for causes thereafter arising, as if the same had been originally filed in such corrected form; but no new matter shall be introduced into the specification, nor, in case of a machine patent, shall the model or drawings be amended, except each by the other; but, when

there is neither model nor drawing, amendments may be made upon proof satisfactory to the commissioner that such new matter or amendment was a part of the original invention, and was omitted from the specification by inadvertence, accident, or mistake, as aforesaid." This enactment is the same as section 53 of act of July 8, 1870, (16 St. at Large, 205.) The word "specification," when used separately from the word "claim," in section 4916, means the entire paper referred to in section 4888, namely, the written description of the invention, "and of the manner and process of making, constructing, compounding, and using it," and the claims made. The word "specification," meaning description and claims, is used in that sense in sections 4884, 4895, 4902, 4903, 4917, 4920, and 4922. In some cases, as in sections 4888 and 4916, the words "specification and claim" are used, and in section 4902 the word "description" and the word "specification" are used. But it is clear that the word "specification," when used without the word "claim," means description and claim.

Therefore a re-issue is allowed, under section 4916, when the specification is defective or insufficient in regard to either the description or the claim, or to both, to such an extent as to render the patent inoperative or invalid, if the error arose in the manner mentioned in the statute. In such case there may be a corrected specification—that is, one corrected in respect to description or claim, or both,—and there may be a new patent in accordance therewith, but the new patent must be for the same invention. This does not mean that the claim in the re-issue must be the same as the claim in the original. A patentee may, in the description and claim in his original patent, erroneously set forth, as his idea of his invention, something far short of his real invention, yet his real invention may be fully described and shown in the drawings and model. Such a case is a proper one for a re-issue. A patent may be inoperative from a defective or insufficient description, because it fails to claim as much as was really invented, and yet the claim may be a valid claim, sustainable in law, and there may be a description valid and

sufficient to support such claim. In one sense such patent is operative and is not inoperative. Yet it is inoperative to extend to or claim the real invention, and the description may be defective or insufficient to support a claim to the real invention, although the drawings and model show the things in respect to which the defect or insufficiency of description exists, and show enough to warrant a new claim to the real invention. It can never be held, as it never has been held, in a case where the point arose for decision, that a patent cannot be re-issued where a suit could be sustained on the specification and claim as they are.

The word "specification" was used in section 13 of the patent act of July 4, 1836, (5 St. at Large, 122,) in a different sense from that in which it is used in section 53 of the act of July 8, 1870, (16 St. at Large, 205,) and in section 4916 of the Revised Statutes, taken from section 53. The provision of section 13 of the act of 1836 was that a patent might be re-issued when it was "inoperative or invalid by reason of a defective or insufficient description or specification," and the new patent was to be issued with a corrected "description and specification." This language was based on that of section 6 of the act of 1836, which required the inventor to give in writing a description of his invention, and of the manner of making and using it, and also to "particularly specify and point out" what he claimed as his invention. Under this language the "specification" was the claim, and the rest was the description. This distinction was kept up in section 13 of the act of 1836. But in section 26 of the act of 1870 the word "specify" is omitted, and the words "specification and claim" are used, applying the word "specification," in that connection, to the description alone. This state of things continues in section 4888 of the Revised Statutes. Then, as before pointed out, the word "description" is omitted in section 53 of the act of 1870 and in section 4916 of the Revised Statutes, and the word "specification" alone is preserved, meaning, when used without the word "claim," the description and the claim. But the meaning of section 13 of the act of 1836, and of section 53 of the act of

1870, and of section 4916 of the Revised Statutes, is the same, and the cases for a re-issue are the same under all these enactments.

The view urged for the defendants is that the original patent was intended to secure the invention of a collar having, as its only peculiarity, two separate short or sectional bands, each commencing at the center, or at any point between the center and the end, and extending to and beyond the end of the collar; that the original specification and drawings show applied to the body of the collar two short bands, each covering a section, as distinguished from one long continuous band along the entire lower portion of the collar; that such invention was fully covered by the claim of the original patent, and was correctly described and represented in the specification and drawings of the original patent; that the original specification and claim contained all that the invention really was; that the re-issue covers a new invention; that in the re-issue the invention is made to be one of a collar having curved and graduated bands, and having the rear button-hole thrown into the top or body of the collar, above the band; and that the re-issue is so framed as to cover a long continuous band, narrowed in the center.

A reference to cases decided by the supreme court in regard to re-issued patents will show that the views before set forth on the subject of re-issues are consistent with those decisions. In *Batten* v. *Taggert*, 17 How. 74, a patentee invented an apparatus for breaking coal, and combined it with an apparatus for screening coal, which he did not invent, and took a patent for the combination only. Afterwards he took a patent for the said breaking apparatus. Afterwards he surrendered both patents and took a re-issue of the first one for the breaking apparatus alone. It was held that, although he had in the first patent described the breaking apparatus without claiming it by itself, and although he had surrendered the second patent, the re-issue was valid. The re-issue described essentially the same machine as the first patent, but claimed, as the thing invented, the breaking apparatus only. The court say: "And this the patentee had a right to do. He had

a right to restrict or enlarge his claim so as to give it valid-
ity, and to effectuate his invention." In that case the de-
scription in the specification of the first patent was sufficient
for the claim of that patent, and that claim was sustainable
in a suit on that patent; yet that claim did not effectuate the
real invention, which was the breaking apparatus alone, out
of combination with the screen; and the case was held to be
one proper for a re-issue.

In *Burr* v. *Duryee*, 1 Wall. 531, it was held that the Boy-
den machine did not infringe the Wells re-issue, and that if it
did the re-issue was void. The claim of the re-issue claimed
"the mode of operation, substantially as herein described, of
forming bats of fur fibers of the required varying thickness,
from brim to tip, which mode of operation results from the
combination of the rotating picking mechanism, or the equiv-
alent thereof, the previous former and its exhausting mechan-
ism, or the equivalent thereof, and the means for directing
the fur-bearing current, or the equivalent thereof, as set
forth." The court held that the invention of Wells was an
improvement in a machine having certain peculiar devices,
and that the Boyden machine had none of those peculiar
devices, nor any substantial identity with them; and that the
original patent claimed the whole of Wells' invention—no
more, no less.

In *Seymour* v. *Osborne*, 11 Wall. 516, 544, it is said that the
commissioner of patents may, on a re-issue, "allow the pat-
entee to redescribe his invention and to include in the descrip-
tion and claims of the patent not only what was well described
before, but whatever else was suggested or substantially indi-
cated in the specification or drawings which properly belonged
to the invention as actually made and perfected. Interpola-
tions of new features, ingredients, or devices which were
neither described, suggested, nor indicated in the original
patent or patent-office model are not allowed, as it is clear
that the commissioner has no jurisdiction to grant a re-issue
unless it be for the same invention as that embodied in the
original letters patent. * * * Corrections may be made
in the description, specification, or claim, where the patentee

has claimed as new more than he had a right to claim, or where the description, specification, or claim is defective or insufficient; but he cannot, under such an application, make material additions to the invention which were not described, suggested, nor substantially indicated in the original specifications, drawings, or patent-office model." These remarks were made in regard to section 13 of the act of 1836, and they recognize that an insufficient description, or an insufficient claim, or both, may be amended in particulars substantially indicated in the original specification or drawings or model. They give no countenance to the view that this cannot be done if the claim of the original patent is a good one, on a description sufficient to sustain it.

The case of *Gill* v. *Wells*, 22 Wall. 1, arose under the act of 1836, on a re-issue, in 1868, of the same patent that was involved in *Burr* v. *Duryee*. In that case the specification of the re-issue differed from that of the original in leaving out the whole description of the chamber or tunnel, and its appendages, and substituting a full description of other devices different from the chamber, in form at least, to perform the functions of the chamber and its appendages, as described in the original. Material matters were left out of the specification of the re-issue, when compared with the original, and new features were introduced in the description of the devices to be employed in guiding the fibers of the fur when taken from the feeding mechanism by the rotating brush or picker, such devices being different in form, and with different names from those described in the original specification as the means to accomplish the same end. It was held that this made the re-issue invalid. Much is said in the opinion in *Gill* v. *Wells* that was unnecessary to the decision in that case, and what was so said seems to have been disregarded by the same court in the subsequent case of *The Corn Planter Patent*, 23 Wall. 181, which there sustained re-issued patents on the sole ground that the re-issues were for things contained within the machines and apparatus described in the original patents, against the dissenting opinion of the judge who delivered the opinion of the court in *Gill* v. *Wells*, and who sought to apply

to the corn-planter case the views he had set forth in *Gill* v. *Wells*. These cases are commented on in *Herring* v. *Nelson*, 14 Blatchf. 293, and in *Christman* v. *Rumsey*, 17 Blatchf. 148.

In *Russell* v. *Dodge*, 93 U. S. 460, the original specification, as appears from *Klein* v. *Russell*, 19 Wall. 433, made it essential that the fat liquor should be heated to or near the boiling point, and then compounded with the other substances named, and then applied to the skins. The description to that effect was clear. The claim claimed "the process substantially as herein described of treating bark-tanned lamb or sheep-skin by means of a compound composed and applied essentially as specified." The specification of the re-issue stated that it was desirable to heat the fat liquor to or near the boiling point, and that it was preferred to use the same in connection with other ingredients, which other ingredients were named. The mode of application was set forth, and was to be by applying either the fat liquor or the compound to the skin. The claims of the re-issue were these: "(1) The employment of fat liquor in the treatment of leather, substantially as specified. (2) The process, substantially as herein described, of treating bark-tanned lamb or sheep-skin by means of a compound composed and applied essentially as specified." In *Russell* v. *Dodge* the court held that the re-issue was (1) for the use of fat liquor in any condition, hot or cold, in the treatment of leather, and (2) for a process of treating the skin by means of a compound in which fat liquor is the principal ingredient; that thus the re-issue covered the use of the fat liquor, hot or cold, and when used alone or in a compound with other ingredients; that the re-issue omitted important particulars, so as to enlarge the scope of the invention; and that the change made, by eliminating the necessity of using the fat liquor in a heated condition, and by making its use in that condition a mere matter of convenience, enlarged the character and scope of the invention, and made the re-issue a patent for a different invention. This decision may well be a precedent for a case like it in its facts. But in every case a re-issue must be adjudged

of by its own facts. General observations by a judge or a court, in deciding a case, must always be read in view of the facts of the case that was *sub judice,* and are not necessarily authoritative, *ex vi termini,* in another case where the facts are not the same, although entitled to consideration, as are the views of a text-writer of experience and repute. This case of *Russell* v. *Dodge* is often cited, as it has been in the present case, as authority for the proposition that where the claim of a patent is valid, and the descriptive part of the specification is sufficient to support it, the patent cannot be re-issued. The re-issue in that case was invalid for other reasons assigned, and the case does not lay down the above proposition, nor does any case yet decided by the supreme court announce such a proposition to be the law. It will be a sad day for inventors and patentees when the highest tribunal does make an authoritative decision to that effect in those terms. Large numbers of patents have been re-issued and sustained in suits, and vast sums of money have been invested and expended in reliance on the re-issues, where they were worthless if the fact that the claims of the original patents were valid and sustainable, on the descriptions and drawings appended to them, rendered the re-issues invalid.

In *Powder Co.* v. *Powder Works,* 98 U. S. 126, the original patent was for different processes and appliances for exploding nitro-glycerine, while the re-issues were for compositions of matter. The supreme court held that the processes described in the original had no connection with the compounds patented in the re-issues; that they were not processes for making those compounds; that, in describing the processes, the compounds were not mentioned; and that the invention of the one did not involve the invention of the other.

In *Ball* v. *Langles,* 18 O. G. 1405, recently decided by the supreme court, the original specifications and drawings showed an oven so constructed that the products of combustion did not and could not pass directly into it. In the re-issue the oven was made a part of the passage-way for the products of combustion, and it was held bad.

In the present case the original specification describes the

advantages of the new collar in the same terms that are used in the re-issue. The bands are described in both as extending from the center of the collar, or from some point between the center and the ends, each way to and beyond the ends. In the original the bands are called "sectional bands" and "short or sectional bands." In the re-issue they are called "curved and graduated bands," and "graduated bands," and "shorter graduated bands." But in the original the bands are described as continuing, after they start, "with a graduated curve to and beyond the ends of the collar," and "with a graduated curve and increasing width to and beyond the ends of the collar." The drawings in the original and the re-issue are identical. The drawings show the rear button-hole as thrown into the top or body of the collar above the band, but the specification of the original omitted any description of such location of the button-hole. The original specification states that "the use of the short or sectional bands produces a saving of material as compared to the old style of continuous band." The description in the re-issue states that "the shorter graduated bands produce also a considerable saving of material as compared to the old style of continuous band that extends at uniform width along the lower part of the collar." This was a proper correction, as it is evident that the expression "continuous band" in the original, in that connection, meant a continuous band of uniform width, because the original provided for a continuous band of decreasing width from the ends towards the middle, each way. The band would be continuous, if the two sectional bands started from the center, but would not be of uniform width, because the parts proceed with a graduated curve and increasing width. A division at the center into two sectional bands would not make the whole band any less a continuous band with a graduated curve and increasing width towards each end, nor would the use of a continuous band of the latter description make the parts of it each side of the center any the less sectional bands. Neither would be a continuous band of uniform width, and, as compared with that, there would be a saving of material by the use of either ar-

rangement. It is manifest that it makes not a particle of difference in the Wilson invention whether there is a vertical seam in the center of the band or not, provided the other features of the collar exist, and that, if there existed before his invention a collar having those features, the fact that it had not such vertical seam would not distinguish it from the Wilson invention. The real invention shown in the original specification is that claimed in the re-issue. The re-issue is valid, and is infringed by the defendants in the collars F, G, H, and I, which have all the features of the Wilson collar, and have no vertical seam at the center of the band.

The principal defence is on the question of novelty. The Wilson patent is not for a design or for a shape. Shape is not involved, except so far as a particular shape may result from the mechanical construction patented. To show a prior collar having the same shape, in outline, as a whole, will not defeat the patent, any more than a collar having the same shape, in outline, as a whole, will necessarily infringe, though not having the same mechanical construction. The general shape, in outline, of the one collar, consisting of body and band, as a whole, may be the same as that of another collar, yet there may be such differences in the shapes of the bodies and the bands of the two, relatively to each other, and such differences otherwise, as to make the two different as mechanical structures.

Exhibit No. 3 and Exhibit No. 16 are short-band collars. But they are not the Wilson collar. They do not embody its features. Photograph G G, where the upper collar is No. 16, and the lower one No. 3, and the middle one the Wilson collar, shows this. A comparison of photograph H H, of the Wilson collar, with photograph I I of No. 16, shows the difference between those two; and a comparison of the former with photograph J J, of No. 3, shows the difference between those two. Photographs K K and L L, in which the upper collar is No. 3 and the lower collar is the Wilson collar, show the different position and action of the two on the neck and on the shirt to which they are buttoned, resulting from their mechanical construction. The evidence shows

that neither No. 3 nor No. 16 has the same action on the neck-band of a low-cut shirt that the Wilson collar has.

The defendants claim to have shown that collars with a graduated band, being a continuous band, narrow in the center, and having the back button-hole in the body of the collar, and in substance like the defendants' collars, F, G, H, and I, existed before Wilson's invention. Mr. Coon, one of the defendants, testifies that in December, 1876, or January, 1877, which was before Wilson's invention, he saw at J. S. Lowery & Co.'s., in the city of New York, a collar like the defendants' collar, H, with the button-hole in the body of the collar, above the band. Neither the collar he so saw, nor any collar that was at Lowery & Co.'s at that date, is produced. He is asked whether the band was narrowest in the center, and he replies, "I should think it was." On cross-examination, he states that he had known Lowery & Co. for 15 years or more, and been in the habit of selling to them; that he saw there only a few samples of the collar referred to; that he bought none and took none away; that that was the first time he had seen any of such collars; and that he was not impressed with them at all, and did not pay much attention to them, and did not think it worth while to make any like them. The success of the Wilson collar, and the fact that the defendants made none of their infringing collars till after they had seen the Wilson collar, and the fact that the Wilson collar supplied a want in the mechanical construction of a collar which had been felt, and that many arrangements, more or less successful, had been devised to try and attain the result attained by the Wilson collar, go very far to show that no collar known to the trade prior to the Wilson collar could have been substantially the Wilson collar, or it would at once have been taken up and have met with the same success which attended the Wilson collar. On this view, and on the evidence of Mr. Coon, taken as a whole, about this Lowery collar, it cannot be held to have been shown satisfactorily that the defendants' collars existed in that collar before Wilson's invention.

Mr. Merwin testifies that he sold some finished four-in-

hand collars, with wide bands, to a customer named Beach, in 1876; that, at the request of Beach, the central part of the band behind was then cut out with scissors, and a slit for a button-hole was cut above in the body of the collar, in one or more of those collars; that the collar was not then stitched up in Merwin's store, nor the new button-hole worked; that he never made any of such collars of the new cut to sell; that he never had any in his store for sale during 1876 and 1877; and that he does not know of any collars ever being on the market for sale, made by cutting out such part of the band on the four-in-hand-collars. No original collar so cut out at the time is produced. Mr. Merwin now takes a four-in-hand collar and marks on it with a lead-pencil and says the change was "about like that," and that "it was cut out by that line about, as nearly as I can judge." Mr. Merwin says, also, that he either marked out such a collar, or cut out a pattern to make some by, and sent it to Mr. Crissey. Mr. Crissey states that Mr. Merwin, in the summer of 1876, cut out, in his presence, a four-in-hand collar, cutting the button-hole in the body above the band; that he, Crissey, had two dozen of such collars made at his factory in Troy; and that he sold some of them, "if my memory serves me," and used part of them for samples. He does not describe the collar. He is made, by leading questions, to testify thus: "*15 Q.* Was the shape of the collar, so cut out, similar in principal and design to defendant's Exhibit No. 4? (Exhibit No. 4 being shown.) *A.* I should say that it was. *16 Q.* It was narrowed in a graduated curve towards the center, in that form, was it? *A.* Yes, sir. *34 Q.* And in the collar you manufactured, as testified to by you, they were narrowed down towards the center? Were they narrowed down, or not, towards the center, in the body of the collar? *A.* Yes, sir; as nearly as I remember now." He says that he sent the two dozen, when made, to Merwin & Co. But Merwin testifies to nothing of that kind. On the contrary, he says that he never had any in his store for sale in 1876 and 1877. Mr. Crissey afterwards produces a drawing made

in September, 1875, of the collar to which he says he refers. But no original collar is produced. It does not appear that any were sold in the finished state, or how they answered the purpose aimed at. Exhibit No. 4 and Exhibit No. 19 are are produced as showing the collar referred to. The fore-woman of Crissey's factory in 1875, having charge of the sewing, and turning and binding of the collars, and making button-holes in them, says that she saw no collar there like either Exhibit, in 1875 or 1876 or 1877. The woman who says she cut all the button-holes in special-order collars, made in Crissey's factory in 1875 and 1876, says she never saw such collars as Exhibit No. 4 and Exhibit No. 19 there, and never cut button-holes there placed like the button-holes in those Exhibits. In view of the foregoing testimony, and of the evidence that this cut-down four-in-hand collar, whatever it was, attracted no attention in the trade so as to make any demand for it, and of the great demand that at once arose for the Wilson collar when it became known, it must be held that it is not established that the Wilson collar is anticipated by anything done by Merwin or by Crissey, or that the defendants' collars are shown to have existed in any collar got up by Merwin or by Crissey. I see no sufficient evidence that a collar like No. 18 anticipates the Wilson collar.

As to Exhibit No. 17, the Herald collar cut down by Townsend, the evidence is not satisfactory that this identical collar No. 17 was not cut down after Wilson made his invention. No collar cut down by Townsend except No. 17 is produced. As to the others which Townsend cut down all rests in memory. The exact shape and fit and operation of them cannot be told. He merely says he cut them out in the back to lower them, or had them cut out. He evidently regarded them as experimental, for he says he did not wear them long, and got collars of another style. They suggested to no one the idea of making any like them for sale. The case is not like that of *Coffin* v. *Ogden*, 18 Wall. 120, where Erbe regarded his lock as a perfected and complete invention. It is controlled by the principles which governed in *Gaylor* v. *Wilder*, 10 How.

477; *Hall* v. *Bird,* 6 Blatchf. 438; *Cahoon* v. *Ring,* 1 Cliff. 592, 611, 612; and *Hartshorn* v. *Tripp,* 7 Blatchf. 120.

The same observations dispose of the cutting out of the four-in-hand collars which Parker caused to be done.

The duplex-curve collar, of which the Umpire, Exhibit No. 9, may be taken as a specimen, does not anticipate the Wilson invention. As before remarked, it is not the design or outline of the whole collar, composed of body and band, that is patented by Wilson. The duplex-curve collar has no such arrangement of band as the Wilson collar has. It has a band of substantially uniform width, though not a straight band, the lower line of the band being a duplex curve, and the upper line corresponding with the lower line, as far as the upper line extends. This is, doubtless, the "old-style curved band," mentioned in the Wilson specifications. There is novelty and utility in the Wilson collar, resulting from the bands in it, beyond what is found in the duplex-curve collar; and, besides that, the duplex-curve collar did not have the buttonhole in the body of the collar.

Defendants' Exhibits Nos. 22, 23, and 24, and the English Lawrence patent, do not anticipate the Wilson invention, as clearly appears from the testimony, in connection with plaintiff's Exhibits N N, O O, P P, Q Q, and R R.

The plaintiff is entitled to maintain this suit in his own name. It is not shown that any one else has any title in the patent. There must be a decree in favor of the plaintiff for a perpetual injunction, and an account of profits and damages, with costs.