## AMERICAN SULPHITE PULP CO. v. BURGESS SULPHITE FIBRE CO. et al.

(Circuit Court, D. New Hampshire. July 11, 1900.)

### No. 302.

1. PATENTS—PRELIMINARY INJUNCTION—EFFECT OF PRIOR ADJUDICATION.

In granting a preliminary injunction against the infringement of a patent which has been sustained by the circuit court of appeals in contested litigation against other defendants, a circuit court is not making any new adjudication, but is merely protecting an established right, and is precluded from considering many grounds of defense which otherwise might properly be urged against such application.

2. SAME.

The rule that, to entitle a plaintiff to a preliminary injunction against infringement of a patent, his right must be established by prior adjudication or long acquiescence or beyond doubt, applies not only to the validity of the patent, but to the question of infringement.

3. SAME.

A judgment of the circuit court of appeals sustaining the validity of a patent will, ordinarily, be considered as conclusive by a circuit court on a motion for a preliminary injunction in a subsequent suit against a different defendant, although all the issues involved in the prior suit were not specifically passed on in the opinion of the court.

4. SAME—ANTICIPATORY MATTER.

New matter of anticipation offered on a motion for preliminary injunction, to avoid the effect of a prior judgment sustaining the patent, must be of a very substantive character.

5. SAME—INFRINGEMENT—WOOD-PULP DIGESTERS.

The Russell reissue, No. 11,282 (original No. 445,235), for improvements in wood-pulp digesters, claim 1, held not anticipated, and valid, on a motion for a preliminary injunction, following prior adjudications, and infringed by certain digesters in use by defendant, and not infringed by another.

In Equity. Suit for infringement of a patent. On motion for a preliminary injunction, heard July 10 and 11, 1900.

The following are the affidavits for complainant:

#### Affidavit of William E. Jolbert.

William E. Jolbert, of lawful age, being duly sworn, deposes and says: I reside in Berlin, N. H., and am a mason by trade. I worked at the mill of the Burgess Sulphite Fibre Company at Berlin, N. H., and worked upon the lining of all the digesters now in use in that mill. These digesters are ten in number, and all constructed of an outer shell of steel plates, about one inch in thickness. Six of these ten digesters are all lined alike, and in the following manner: First, a coating formed of a mixture or thick paste of Portland cement, ground slate, and silicate of soda, from an inch to an inch and a half thick, was laid directly upon the inner surface of the steel shell of the digester by workmen, and pressed onto the same with hands, so as to make a continuous adhesive coating or lining of the mixture all over the interior of the shell. This coating was then dried by heat applied to the outside of the

shell. Upon this coating was applied another similar paste or mixture of the same ingredients, but with less cement, and more ground slate and silicate of soda, being somewhat more soft or plastic than the first mixture named, and about one inch to an inch and a half thick. This coating in like manner was continuous all over the interior of the digester, and was put on by hand and in the same manner as before. On this second or interior coating there was then set a layer of blocks made of a mixture of Portland cement, ground slate, ground glass, and silicate of soda. To make these blocks the mixture was poured into molds of various sizes and shapes, corresponding to the different parts of the digester, and about two inches thick, and the blocks thus formed were subsequently dried. These blocks were set in place by pressing them against the inner surface of the paste layer before mentioned, and, where there were spaces behind or between the blocks, these spaces were filled up by pouring in a grout of the same mixture as above. Over this layer of blocks there was then applied with a trowel a layer of a n :ture of Portland cement and sand mixed with water, about one and one-half inches to two inches in thickness, and this was faced up or lined on the inside with a layer of hard-burnt brick, laid with a mortar of Portland cement, sand, and water, in the ordinary manner. Digesters 7, 8, and 9 are lined in the same manner as Nos. 1 to 6, except that the layer of Portland cement, sand, and water next to the blocks is omitted, and the facing bricks are laid up from one-half inch to an inch from the blocks, and the intermediate space filled by grouting in a mixture of Portland cement, ground slate, ground glass, and silicate of soda. In lining digester No. 10, the first two coats or layers of material were applied by hand to the shell in the same manner and to the same thickness as previously stated. Upon the inner face of the inner layer is set a layer of hard-burnt brick, the same being pressed into place by hand, and over this layer a second layer of hard-burnt brick is set, at a distance of about one-half inch, on wedges, and the spaces between filled up by grouting in a mixture of Portland cement, ground slate, ground glass, and silicate of soda.　　　 William E. Jolbert.

[Oath November 9, 1899.]

### Affidavit of Charles C. Springer.

Charles C. Springer, of lawful age, being duly sworn, says: I reside at Boston, Mass. I am manager of the pulp works at Mt. Tom, Mass., and have been so for the last nine years, and am also treasurer of the American Sulphite Pulp Company, complainant, and have been so for the last fourteen years. I am well acquainted with the art of lining pulp digesters, and I testified as an expert on the questions of substantial identity and difference of lined pulp digesters in the suit (mentioned in the bill) by the complainant against the Howland Falls Pulp Company, in which the court of appeals for the First circuit held the George F. Russell reissue patent (here in suit) to be valid, and to be infringed by the linings applied to the Howland Falls Pulp Company's digesters by Curtis & Jones. These Curtis & Jones linings, as appears by the testimony in that case, were as follows: A layer of cement mixture was applied with a trowel directly to the shell, and blocks of cement mixture were set up at a distance from this first layer, and cement mixture grouted into the space between them, thus making three coverings of cement mixture, viz. (1) the plaster layer, (2) the grouted layer, and (3) the block layer; the total thickness of cement mixture being about six inches. The cement mixture used for all layers—plaster, grouted, and blocks—was Portland cement, ground quartz, and silicate of soda. Of this lining Judge Putnam, in his opinion in the circuit court, said: "If the patentee (Russell) was entitled to his patent at all, the defendant's method of obtaining a continuous lining of cement is plainly within its scope, and it differs so unsubstantially from the method described in the patent that it has the appearance of a mere evasion, easily devised when sought for, and plainly within the rules touching equivalents." And the court of appeals, in its opinion in favor of the plaintiff, quoted this language, and said: "In this we fully agree." Comparing this Curtis & Jones lining with that described in the affidavit of William E. Jolbert as the lining of the digesters of the defendants in the present case, I find that the defendants have ten digesters, all having an outer shell of steel, lined with a cement mixture of Portland cement, ground slate, and silicate of soda. Of these ten digesters six are lined thus: One to one and a half

inches of the cement mixture applied by hand to the inner surface of the shell, and dried by heat. To this dried coating there is applied "another similar paste or mixture of the same ingredients, but with less cement, and more ground slate and silicate of soda, being somewhat more soft and plastic than the first mixture, and one to one and a half inches thick." Upon this second coating there was set "a layer of blocks made of a mixture of Portland cement, ground slate, ground glass, and silicate of soda, * * * about two inches thick." Over this layer of blocks there was then applied with a trowel a layer of a mixture of Portland cement and sand mixed with water, in which was set a layer of hard-burnt brick. Three of the ten digesters were lined in the same manner, except that the facing brick, instead of being set in the mixture of Portland cement, sand, and water, was set in about one inch, and the space filled by grouting in a cement mixture like that previously applied. One of the digesters was lined thus: The first two coats or layers of cement mixture were applied by hand to the shell, in the same manner and to the same thickness as previously stated, giving a total thickness of about three inches, and on this was applied burnt brick in two successive layers, with a space about one-half an inch between them, which was filled in with a grout of Portland cement, ground glass, and silicate of soda. The last-named one of these ten digesters has, it will be noted, a thickness of about three inches of cement mixture next the shell. This is just about (rather more than) the thickness of a Russell cement lining which was applied by the plaintiff on a digester of Wilkinson Bros. at Sheldon, Conn., some years ago, and which gave very good practical results. In my opinion, all of the ten linings of the present defendants are substantially the same as the Curtis & Jones lining used by the Howland Falls Pulp Company, and, like them, they have the lining described in the Russell reissue patent; that is to say, "on the interior of the shell is formed a continuous lining or coat of acid-resisting material of the nature of a cement, composed of a mixture of materials which is acid-resisting, and capable of being made plastic and adhesive to the shell of the digester, and so compact as to prevent the acid solution from reaching the shell under the high steam pressure required in practice." This is the "continuous lining or coat of cement, as described," recited in the first claim of the Russell reissue patent. Furthermore, there is in each of the said ten digesters "an interior lining of tiles, C," as recited in the second claim of the said patent, to prevent mechanical abrasion of the cement lining.

[Oath November 13, 1899.]     .     Charles C. Springer.

### Affidavit of George W. Russell.

George W. Russell, of lawful age, being duly sworn, says: I reside in Boston, and am the president and general manager of the American Sulphite Pulp Company, complainant in this suit. On the 24th of last month the plaintiff, through me as its president and general manager, addressed and mailed to the Burgess Sulphite Fibre Company a letter in the following terms:

"Boston, October 24, 1899.

"The Burgess Sulphite Fibre Co., Berlin, N. H.—Gentlemen: Under date of February 9, 1899, we wrote you in reference to your infringement of the Russell patent owned by us for cement-lined digesters, and demanded of you a payment of royalty, and stated, if the same was not paid, we should proceed against you legally. Having received no reply to this letter, we now notify you that unless we receive from you, on or before the 1st day of November, 1899, payment of royalty at the rate of $500 per ton daily capacity of your mill, in cash or its equivalent, we shall at once proceed against you by bill in equity for an injunction and accounting.

"Yours, respectfully,     American Sulphite Pulp Company,
"By George W. Russell, President."

This letter was inclosed in one of our business envelopes, having our name and address printed thereon in the usual way to insure return to the sender if the person addressed does not receive the letter. I have not had the letter returned, and have no doubt that it was duly received by the Burgess Sulphite Fibre Company. No answer to it has been received. This letter was only the last step in a long history of negotiations with the Burgess Sulphite Fibre Company for the purpose (on our part) of inducing them to recognize the

validity of the G. F. Russell reissue patent, and to pay the royalty charged by the company. The practice of our company, and the manner in which alone we have undertaken to make use of the Russell reissue patent owned by us, on which this suit is founded, is to grant licenses to pulp manufacturers on royalty. The rate of these licenses to infringers has been, and is, not less than $500 per ton daily capacity of production of sulphite pulp of the plant or mill proposed to be licensed in each instance. In a few cases we have accepted less than this in cash, but our regular rate has been, and is, $500 per ton, as stated. That this is a reasonable rate appears from the fact that we have received it from infringers and others to the number of about thirty concerns. The defendants have been offered a license at this rate of $500 per ton, but they have refused to accept the offer, and are continuing their infringement in defiance of our rights under the patent.      Geo. W. Russell.

[Oath November 13, 1899.]

The following extracts from the brief of defendants describe the digesters as made by defendants:

### Defendants' Digester Linings Herein.

For the purposes of this motion, the statements in the affidavits filed on the part of the defendants, as to exactly what the linings of their digesters were, which statements are made with great detail and minuteness, must be accepted as the defendants' structures of digester linings before the court, and on comparison of which with the first claim of the Russell patent the question of infringement shall be decided. It is true that the complainant has not had the benefit of cross-examining the persons who make affidavits in this respect for defendants, but this is incident to the method necessarily pursued in relying on affidavits on such a motion as this. Complainant has had an opportunity for filing rebuttal affidavits, and, while these rebuttal affidavits raise a few points of difference, these points are not really material, and even these points are to a great extent controverted by defendants' affidavits in surrebuttal. It is impossible, within the proper limits of this brief, to set forth the allegations of the respective parties in detail. We shall present a brief statement of defendants' construction of linings, and show—First, that it is not the construction of lining contained in the Howland Falls digesters, and, therefore, has never been the subject of any adjudication by the courts; and, second, that it is not in any event a construction of lining which can be held to infringe the Russell first claim; and, third, that, in any event, the question presented, in view of the state of the art and proper construction of that claim, is of such doubt that it should not be resolved as against the defendants on a preliminary motion of this kind, especially in view of all the other considerations heretofore adverted to in this case.

### Linings of Nos. 1, 2, 3, 4, 5, and 6 Digesters.

The outer digester shell of all the defendants' digesters is made of steel plates about one inch in thickness and riveted together at the joints. These six digesters were then lined, next their shells, as follows: (1) The interior of the shell was painted with a coat of graphite paint about one-sixteenth of an inch thick. (2) Next came about one-quarter inch of composition, made of slate, Portland cement, and silicate, put on in slabs, noncontinuously, and baked on before the application of the next layer. (3) Next came about one-quarter inch of composition, made of slate, Portland cement, and silicate, put on in slabs, breaking joints with layer No. 2. (4) Next came about one-quarter inch of composition, made of slate and silicate, and containing no cement, which was also put on in slabs, breaking joints with the last previous layer. (5) Next came a coating about one inch thick of home-made brick or tiles, made of slate, Portland cement, glass, and silicate, and set in place by grouting behind and between them with a plastic mixture of the same material. These bricks are special in shape, to fit different parts of the digester at curves and openings. (6 and 7) Next was applied another layer of facing, composed of regular vitrified bricks, about eight by eight inches, and about two inches thick, which were entirely impervious to the acid used in the digester. These vitrified bricks are also special in shape, to fit different parts of the digester at curves and openings. "They were grouted into place,

and laid up one by one, and one row after another, imbedded in a roughly-applied layer of material, consisting of a mixture of 50 per cent. Portland cement, 50 per cent. of sand, and of nothing else, and mixed in water, instead of silicate of soda. Finally, all of the joints between the vitrified bricks were carefully filled and pointed up with a lead paste, consisting of 90 per cent. litharge (oxide of lead) and 10 per cent. white lead (carbonate of lead), mixed with enough glycerine to serve as a binding material. All of these joints were and are carefully filled and pointed with lead paste, and the lead and glycerine in the paste form a chemical union, and produce, when the matter is hardened, an intensely hard and acid-resisting material, and form a most durable joint between the vitrified brick. We were led to use this lead paste for pointing up the joints above described because we found that the acid used in the digesters rapidly ate and disintegrated the cement between the bricks. The linings thus constructed, with their inner face of vitrified brick pointed up with lead paste, have many times the durability under the action of acid that is possessed by any form of Portland cement and sand mixture known to me, and are absolutely unattacked by acid."

### Linings of Nos. 7, 8, and 9 Digesters.

These three digesters "are lined in precisely the same manner as those above described (viz. Nos. 1-6), except that the painting of the shell with graphite paint has not been practiced. The other layers of the lining are all applied in the same way and in the same order, and the only layer with which the sulphite liquor comes in contact is the continuous layer of vitrified brick with all the joints pointed up with lead paste."

### Lining of Defendants' Digester No. 10.

This digester was lined in a way somewhat different from the other nine already referred to. The reasons for so lining it are stated as follows in the affidavit of T. P. Burgess: "This last form of digester lining was put in about two years ago at the suggestion of counsel, who had acted in the former litigation against the Howland Falls Paper Company, with a view of constructing a digester lining in exact accordance with what is disclaimed in the original patent of Russell, and in the following words: 'I am aware of the use heretofore of a digester lining comprising a layer or coat of masonry or brickwork laid in cement, and make no claim thereto. Such linings I believe to be objectionable. In fact, they are heavy, and require, in many forms of digester, special forms of tile or brick to be constructed to fit various portions of the digester shell, especially around openings and so forth. Furthermore, they are expensive, by reason of requiring to be laid with great care and skill to prevent defective joints through which leakage may take place.'" Digester No. 10 was lined as follows: First, a backing was put in next the shell, composed of a first coat of ground slate and Portland cement, mixed with silicate of soda, rolled into slabs, noncontinuously, and baked on, as before, and over this was a second coat of the same material as the first, also rolled into slabs and put on top of the other, and so put on that the slabs of the second coat broke joints with those of the first. The third coat of this backing was of a different mixture, namely, ground slate and silicate alone, with no cement mixed in. This was put on about one-quarter of an inch thick. Next came a course of vitrified brick, about eight by eight by two and a half inches, made in special forms to fit the digester. These vitrified brick were laid up and squashed into the soft paste precisely as a mason would do it, which resulted in the joints between the brick being partially filled with the pasty layer into which they were squashed. The balance of the joint of this vitrified brick layer was then filled up with a mixture of glass, slate, Portland cement, and silicate. The second course of vitrified brick, the same kind of brick as those used in the first course, was made up in rows, and grouted behind the brick and between the joints with the same material above mentioned,—namely, the composition of glass, slate, cement, and silicate of soda, —and the joints between the vitrified bricks of this inner layer were pointed up with a lead paste, consisting of litharge, lead, and glycerine.

Causten Browne, for plaintiff.

Betts, Betts, Sheffield & Betts, for defendants.

PUTNAM, Circuit Judge (orally). I can see no reason why I should not dispose of this case now. I am sure it will be for the convenience of counsel for me to do so; and, so far as the propositions of law are concerned, I have considered every one of them within a very short time, and would gain nothing by investigating the authorities which have been cited. So far as questions of fact are concerned, I am satisfied I should lose more than I would gain by postponing the consideration of them for an investigation of the record at some future day.

Some reference has been made by the respondents to Westinghouse Air-Brake Co. v. Burton Stock-Car Co. (C. C.) 70 Fed. 619. I always have an unpleasant sense of responsibility with reference to the granting of a preliminary injunction by a single judge, and I am unwilling to grant one when the settled rules of practice do not absolutely require me to. In that case I could not see that the complainant's market was in any way in danger, or anything of substantial value which the complainant would gain by an injunction. Therefore I refused the injunction; and the circuit court of appeals sustained the circuit court,—not on that ground, but on a somewhat different one. 23 C. C. A. 174, 77 Fed. 301. That decision was laid aside in Bresnahan v. Leveler Co., in which the opinion was passed down on June 5, 1900, by the circuit court of appeals (102 Fed. 899), as a very peculiar one; and I cannot, in view of the expressions of the circuit court of appeals, give it any weight here.

This application has been spoken of by counsel for the respondents as asking for judgment at an early stage of the case. In view of the settled practice of the various circuit courts of appeals, as fully recognized in this circuit, it is not asking a judgment; it is asking execution, after a full consideration and adjudication by the circuit court of appeals, although against different parties. The view which I take of the decisions, and of the line of practice as established by the circuit courts of appeals in the various circuits, and especially in this circuit, requires me, against what may be my own personal convictions, to grant an injunction here, so far as nine digesters are concerned.

Much has been said here, and well said, in regard to the question of laches. If this case were one of first impression (that is, one in which the patent had not already been sustained), the suggestions thus made would be quite conclusive on the application for an injunction. But, where we are called on to give effect to a prior decision on a patent, after litigation of the conclusive character described in various opinions of the circuit courts of appeals, the position is entirely different, and the equities which usually reach applications for interlocutory injunctions have very little place. The court to which an application is made for an interlocutory injunction, although against new parties, is simply asked to protect an established right, and not to render a new adjudication.

Of course, equities of a special character may arise in any case which the courts cannot disregard. As, for example, one equity in this case is the fact that an injunction granted in a radical manner,

and without proper provision for the protection of the parties, might do the respondents irremediable injury, far beyond any advantage which would come to the complainant. I think, however, the case will be found, before we get through, to so shape itself that there will be no danger on this score.

The rules with reference to granting interlocutory injunctions in patent causes have been fully explained in this circuit in Wilson v. Store-Service Co., 31 C. C. A. 533, 88 Fed. 286, and in Hatch Storage-Battery Co. v. Electric Storage-Battery Co. (C. C. A.) 100 Fed. 975. The practice is now settled in this circuit in patent causes according to the old rules applied in other suits. The right of the complainant must be established by prior litigation or by long acquiescence or beyond doubt. This applies to all the issues; it applies not only to the question of the validity of the patent, but to the question of infringement, as was fully explained in the case last cited. So far as the patent at bar is concerned, its validity and construction have been settled by the circuit court of appeals in American Sulphite Pulp Co. v. Howland Falls Pulp Co., 25 C. C. A. 500, 80 Fed. 395, and in such way that I am bound by that case. It is true that all the questions which might be raised, and which perhaps will be raised, on the final hearing,—among the rest, the validity of the reissue, and the question of anticipation as applied to the patent as construed by the circuit court of appeals,—have not been passed on by that court. But they were before the court; they were in the record; and the respondent had the right to maintain the decree of the court below on any ground on which it could maintain it, irrespective of the positions taken by the complainant, and irrespective of the complainant's assignment of errors. So it could have availed itself of every one of these defenses, and brought them to the attention of the circuit court of appeals, and sought the judgment of that court on them. Therefore the fact that the circuit court of appeals did not pass specifically on certain issues does not relieve me from acting in accordance with its final determination. Otherwise, there would be no end, and, every time it could be suggested that there was some issue on which the circuit court of appeals had not passed, this court, on a new bill between other parties, would be powerless to act. Theoretically, every question which could have been raised in the circuit court of appeals in the prior litigation has been determined by it. Of course, if, as a matter of fact, certain questions were not determined there which may be hereafter determined, it might be my duty, under some circumstances, to shape the injunction in such way as not to put the parties respondent in a position of urgency until the questions were passed on. But the mere fact that they have not in truth been passed on does not relieve this court from giving effect to the judgment on appeal, nor from giving the complainant relief. The condition here is not extraordinary, and therefore every question which has been raised here, except that of infringement, I must accept as having been already determined.

The new anticipatory matter which has been brought to my attention may, on revision of the case on final hearing in the circuit

court of appeals, in connection with like matter in the prior case, be of importance; but it is, to my mind, subject to the same criticism as like German publications before me in that case. It is merely suggestive and experimental, and not of that full, frank, and practical character which the decisions of the supreme court require in anticipatory publications. I do not see in them, or in the patents which have been brought to my attention, anything of that clear character which would justify me in avoiding the decision in the prior suit. A late case in the circuit court of appeals for this circuit (Bresnahan v. Leveller Co., 39 C. C. A. 508, 99 Fed. 280) holds very emphatically to the rule that new matter, for the purpose of avoiding the effect of an earlier judgment, must be of a very substantive character. So I think that, in everything except the question of infringement, I am practically bound by the prior decision.

On the question of infringement, I have no doubt with reference to the digesters 1 to 9. I have no doubt that the various layers of cement constitute the substance of the lining of those digesters. If, instead of having the layers built up in what Mr. Burgess calls a composite manner (that is, by breaking joints), they were made of a solid mass of cement, it would be at once apparent that there was infringement. To my mind, the building up of these strata or layers by breaking joints is, in the patent law, equivalent to a solid mass of cement; and the whole structure, I have no doubt, is the same as that pointed out by the second claim of the patent in suit. I say this without undertaking to hold that the second claim has any validity, because I do not think it has. I refer to it for the purpose of making clear my view that, in the first nine digesters, the addition of the vitrified brick is purely incidental to a structure consisting of the two elements combined as set out in the first claim of the patent in suit; that is to say, the shell of the digester, and a mass of cement capable of performing the necessary functions of an interior lining.

Without undertaking to go at length into the nature of the lining of the tenth digester, and reserving my views about that until a final hearing, all I need say with reference to it is that it involves too much doubt on the question of infringement to justify me in issuing an injunction against it. The points of doubt are: First: Whether, after all, the real substance of this construction is not that described by the respondents as a purely, bona fide, composite lining. If it is a purely, bona fide, composite lining, fairly so termed, it certainly does not come within the claims of the patent in suit, because the very essence and gist of those claims is that Russell was able to get rid of everything except the shell of the digester and the lining of cement. That is the very pith of his invention. Second. I have doubts whether this digester really shows anything more than is shown by the Pierredon patent,—lava bricks laid in a heavy course of cement; and what is shown in that patent the public has the right to use, independently of any question whether Pierredon saw all the advantage coming from having a heavy cement course under his lava bricks. Third. The testimony

with reference to the substantial advantages and comparative relations of the various parts of the lining of digester 10 are too conflicting to justify the court in basing an interlocutory injunction upon it. On the whole, it is enough for me to repeat that the question of infringement as to digester 10 is too doubtful to justify this court in using the power of a temporary injunction with reference to it.

The decree which will be entered will be in substance as follows: An injunction to issue against digesters 1 to 9, inclusive, to take effect in three months from the entry of the decree; but, in the event there is an appeal, the injunction to take effect in three months from the coming down of the mandate. As to digester 10, the decree will state that an injunction is denied. I name the three-months period because I imagine that will be sufficient to enable the digesters to be relined. If the respondents think three months will not be sufficient, I will enlarge the time.