AMERICAN SULPHITE PULP CO. v. DE GRASSE PAPER CO.

(Circuit Court, N. D. New York. February 12, 1907.)

PATENTS—INVENTION—WOOD PULP DIGESTERS.

The Russell reissue patent, No. 11,282 (original No. 445,235), for an improvement in wood pulp digesters which consists in applying to the inner surface of the metal shell of such a digester a continuous lining or coat of adhesive acid-resisting material applied in a plastic condition to protect the shell from injury by the acid solution used in such digesters is void for lack of patentable invention, in view of the prior art, which disclosed a similar cement lining employed for the same purpose in open vessels used for heating acid solutions. all that is claimed by the patentee being the discovery that it is equally effective under the increased heat and pressure to which it is subjected in pulp digesters, which discovery did not constitute invention. Claim 1, conceding its validity, *held* not infringed.

Suit in equity to restrain alleged infringement of United States letters patent No. 11,282, dated November 15, 1892, for pulp-digester, and issued to complainant, American Sulphite Pulp Company, as assignee of George F. Russell, who filed his application for reissue June 24, 1892.

Howard P. Denison (Frank T. Benner, of counsel), for complainant.
W. B. Van Allen (J. P. Allds and Henry R. Follett, of counsel), for defendant.

RAY, District Judge. This alleged invention relates, as alleged in the specifications, to improvements in the construction of the vessels ordinarily called "digesters," in which wood pulp is manufactured by what is known as the "sulphite process." The patentee declares the object to be "to improve the construction of these digesters so as to prevent their injury by the solution employed." In short, the purpose and object of the alleged improvement in construction is to prevent injury to the digester itself by the solution employed in digesting the pulp contained therein. In other words, to prevent injurious action by the solutions on the walls of the digester.

An analysis of the alleged invention shows as follows: (1) A cylindrical outer shell, ordinarily constructed of metal, such as iron, steel, or brass, and which metals are, says the patent, liable to be injuriously affected by the acid solution employed in digesting the pulp; (2) a continuous lining or coat of acid-resisting material, on the interior surface of this shell, which is to be applied in a plastic condition; and (3) that this lining or coat is of the nature of a cement, and may be composed of any material, or mixture of materials, which are acid-resisting and capable of being made plastic and adhesive to the shell of the digester and so compact as to prevent the acid solution from reaching the iron shell in consequence of, or because of, the high steam-pressure required when the digester is in operation. The patentee says that a convenient material for this interior lining or coat is commercial cement, preferably Portland, made plastic with water, and applied with any suitable implement on the interior of the shell, so as

to form a continuous covering therefor. The specifications then suggest materials other than Portland cement for this lining, but "the long and short of it is" that a plastic material is to be used and it must be so applied as to form a continuous coating, which may vary in thickness; but the coating must be of some plastic and also acid-resisting material, capable of being made, of itself, adhesive to the shell, and also so compact, of itself, when applied by a trowel or similar means, and by that means "compacted," as to prevent the acid solution from reaching the metal shell. The specifications then state that, under some circumstances, it will be found in practice that the friction of the mass of pulp within the digester is liable to wear away the above-described lining. It is then stated that this objectionable feature may be remedied by setting an inner lining of tiles upon the "continuous lining" of cement "the plasticity and adhesiveness of which may be utilized to hold the tiles in place." Also, "In many cases, however, the use of this inner lining of tiles will not be found necessary."

All these matters referred to are stated in the patent in the following language:

"My invention relates to improvements in the construction of the vessels ordinarily called 'digesters,' in which wood pulp is manufactured by what is known as the 'sulphite process.' Its object is to improve the construction of these digesters so as to prevent their injury by the solution employed. * * * A, represents the outer shell of the digester. It is ordinarily constructed of metal—such as iron, steel, or brass—which is liable to be injuriously affected by the acid solution employed. Upon the interior of the shell of the digester, I form a continuous lining or coat, B, of acid-resisting material, applied in a plastic condition: This lining or coat is of the nature of a cement, and may be composed of any material or mixture of materials which is acid-resisting and capable of being made plastic and adhesive to the shell of the digester and so compact as to prevent the acid solution from reaching the iron shell in consequence of the high steam-pressure required in practice. A convenient material for the purpose is commercial cement, preferably Portland, made plastic with water and applied with any suitable implement upon the interior of the digester-shell, so as to form a continuous covering therefor. Other cement-like materials or mixtures having similar properties or characteristics may be used, such as the ordinary cement mixtures, sand, and Portland cement, sand, and tar, and the like. The thickness of the cement lining when compacted as it is by laying on with a trowel will vary more or less according to the different materials used. In practice, I find that with a lining composed of sand and Portland cement a layer of from three to five inches suffices to prevent the acid from reaching the metal shell. Under some circumstances, it will be found in practice that the friction of the mass of pulp within the digester, particularly when of the rotary pattern, is likely to mechanically wear away the lining constructed as described. This objectionable feature may be remedied by setting an inner lining, C, of tiles upon the continuous lining, B, the plasticity and adhesiveness of which may be utilized to hold the tiles in place. In many cases, however, the use of this inner lining of tiles will not be found necessary."

It is self-evident that the improvement which is the subject of the patent is the use on the interior of the metal shell of "a continuous lining or coat of acid-resisting material applied in a plastic condition," and that this coating or lining must be composed of substances capable of being made plastic and adhesive before application to the shell. The object or purpose to be accomplished was, therefore, to prevent the acid solution from reaching, or coming in contact with, the shell

of the digester, and, by its action thereon, injuring it. The means devised or used to accomplish this object or purpose were "a continuous lining or coat, B, of acid-resisting material" applied to the shell in "a plastic condition" and "capable of being made plastic and adhesive to the shell," and, when necessary, the interior lining of tiles to prevent "the friction of the mass of pulp within the digester" from "mechanically" wearing "away the lining constructed as described." The patent is broad, in that any material having these qualities may be used, but narrow, in that this lining or coat complete must be "continuous" and must be composed of materials having the qualities described, viz., "acid-resisting," "adhesive," and "plastic when applied." The claims are two in number, and read as follows:

"(1) The improved pulp-digester herein described, having an outer shell, A, and a continuous lining or coat, B, of cement, as described, applied to the interior of the said shell, for the purpose set forth.

"(2) The improved pulp-digester herein described, having an outer shell, A, a continuous lining or coat, B, of cement, substantially as described, applied to the interior of the said shell, and an interior lining of tiles, C, all substantially as set forth."

The elements of claim 1 are, first, the outer shell, conceded to be old in the prior art; and, second, (a) the continuous acid-resisting lining described; (b) such lining applied to the interior of the shell and adhering thereto, made a matter of necessity; (c) all to serve the purposes "set forth."

The elements of claim 2 are, first, the pulp-digester described, having (a) the outer shell; and (b) the continuous acid-resisting lining or coat of cement applied to the interior of the shell and adhering thereto, made a matter of necessity; and, second, an interior lining of tiles as described. Claim 2 adds the element of "an interior lining of tiles."

These claims are, of course, limited to a "continuous coating" made of "plastic material," when applied, and also "acid-resisting" material. But the patent contains other limitations. He expressly says:

"I am aware of the use heretofore of a digester-lining comprising a layer or coat of masonry or brickwork laid in cement, and make no claim thereto."

This necessarily excludes all linings made of stone and brick or tiles laid in cement whether that cement be Portland, or some other, acid-resisting, or some other, adhesive, or some other, plastic when applied, or otherwise. And it would exclude such a lining of masonry plastered over on one or both sides with the same cement in which laid for such a plastering over of masonry is a common expedient, and has been for centuries. This is a matter of which courts will take notice.

The patent in suit goes on to say:

"Such linings I believe to be objectionable, in that they are heavy and require in many forms of digester special forms of tile or brick to be constructed to fit various portions of the digester-shell, especially around openings, &c. Furthermore, they are expensive by reason of requiring to be laid with great care and skill to prevent defective joints through which leakage may take place. On the other hand. in a digester embodying my improvements the lining may be applied rapidly and easily, and may be composed of material not necessarily expensive. Again, it has been customary to supplement the brick or tile linings heretofore in use with a lining of sheet lead interposed between

the brick or tile lining and the digester-shell. This feature may be entirely dispensed with where my improvement is adopted.

"I mean to be understood that the digester-linings comprising a layer or coat of masonry or brickwork laid in cement, to which I have just referred, have always been, so far as I know, supplemented by a lining of sheet lead interposed between the brick or tile lining and the digester-shell. The construction I refer to as old is that shown and described in the United States letters patent to Mitscherlich, No. 284,319, dated September 4, 1883, in which the digester-shell is protected from the acid solution by a sheet-lead lining, and the only apparent use of the brick or tile lining in addition to the lead lining is to protect the latter from extreme high temperatures.

"I am also aware of the United States patent to Reynolds, No. 423,531, dated March 18, 1890, which describes a digester having a metal shell and an interior structure of brick with leaded joints, a 'fluid-chamber' or space being left between the shell and the brick structure. The patent contemplates the filling of this chamber with fluid—such as air, water, or steam under pressure—in excess of that employed in digesting the pulp, so as thereby to prevent the brick structure from disintegration under pressure from within outward. It also states that the inner surface of the shell may be coated with a paste of red lead, and thus protected against possible injury by acid leaking through the brickwork. Such a structure I consider merely a modification of the Mitscherlich by the addition thereto of the pressure-chamber, the lead paste of Reynolds being the equivalent of the lead sheet of Mitscherlich.

"I am aware that cement linings have been employed in various open vessels used for heating acid solutions; but in such open vessels the temperature never exceeds 212°. In digesting wood pulp by the sulphite process, the contents of the digester are under very high steam pressure, sometimes as much as 100 pounds to the square inch, and I believe it to have been unknown until demonstrated by me that a cement lining would stop the passage of the acid solution to the digester-shell, notwithstanding this high pressure and temperature."

It will be noted that he states, in substance and effect, that in the prior art brickwork or masonry linings laid in cement are common, not built directly against the shell, but having interposed between them and the shell linings of sheet lead. This lead lining was to prevent injury to the shell by preventing the acids contained in the pulp solution from reaching it. This lead would not, probably, adhere to the shell. But that fact is immaterial as it would retain its place held by the shell on the one side, and the masonry lining on the other. Hence, in the patent in suit, so far as claim 2 is concerned, which has the masonry or tile lining in addition to the coating of acid-resisting material, we have a mere substitution in the patent in suit of an acid-resisting adhesive cement coating, plastic when applied, for the acid-resisting lead coating or lining, not necessarily adhesive to the shell, of the prior art. It is true that the patentee says the use of the brick or masonry in addition to the lead lining was to protect the latter from excessive high temperatures while his use of the tile or masonry lining, in addition to the lining of acid-resisting material, is to prevent wear of the latter by the friction of the mass of pulp in the digester. But, later in the specifications, the patent speaks of this great heat and pressure, and, taking the specifications altogether, they ascribe to the cement lining precisely the same function or office performed by the lead lining of the prior art. The prior art also had, and this is stated in the patent in suit, the metal shell and an interior lining of brick with leaded joints and a fluid space or chamber between it and the shell,

filled with air, water, or steam under pressure. This, says the patentee, was to prevent disintegration of the brick lining under pressure from within outward. In fact, it was also to prevent injury to the shell by keeping the acid from it.

But the patent in suit also says, referring to the prior art, Reynolds patent of March 18, 1890, No. 423,531:

"It [the prior patent] also states that the inner surface of the shell may be coated with a paste of red lead, and thus protected against possible injury by acid leaking through the brickwork."

The patentee of the patent in suit also says:

"Such a structure I consider merely a modification of the Mitscherlich [a prior patent] by the addition thereto of the pressure chamber, the lead paste of Reynolds being the equivalent of the lead sheet of Mitscherlich."

But the continuous sheet of sheet lead acid-resisting lining of Mitscherlich was to prevent injury to the digester by the solution employed; that is, to prevent the acid of the solution from reaching the shell. The object of the Reynolds patent in using his continuous coating of a paste of red lead, which is plastic when applied, and also adhesive and acid-resisting, and applying it in a continuous coating on and to the inner side of the digester shell, was precisely the same; that is, to prevent injury to the digester, the shell thereof, by the acids in the solution employed and contained in the mass of pulp. The patent in suit so states. And this is the precise object and purpose of the patent in suit. The object and purpose of each of the two patents referred to in the patent in suit, and which show the prior art, and of the patent in suit are precisely the same. So far as claim 2 of the patent in suit is concerned, the only difference between it and the Reynolds patent is that Reynolds used a coating or lining of red lead, a plastic material, adhesive and plastic when applied, and also acid-resisting, to prevent injury to the shell, by keeping the acids contained in the mass of pulp being digested, from such shell; while the Russell patent in suit uses "any material or mixture of materials which are acid-resisting and capable of being made plastic and adhesive to the shell of the digester, and so compact as to prevent the acid solution from reaching the iron shell in consequence of the high steam pressure required in practice." Reynolds used red lead which answered all of these conditions. He used the interior lining of masonry also. The patent in suit, in claim 1, does not specify the masonry lining, but claim 2 does. The patent in suit is a mere extension of the Reynolds patent by including, not additional means of a new nature, action, or composition, or new means operating differently, but means of the same composition having the same qualities operating in the same way, and which will answer the same purpose, produce the same result, or attain the same object. In short his entire conception of means to attain a well-known and desired result is not that an adhesive, plastic (when applied), acid-resisting material will attain that result under pressure and high temperature, for this he well knew as the prior art, which he in fact knew, taught him that; but that if one plastic, adhesive and acid-resisting material would do it any other would. Hence he tried and found that

Portland cement would do the work, and that any cement-like material having the necessary properties would. This everybody having practical common sense and any knowledge on the subject well knew. The prior art in digesters of this class taught that a firm, plastic (when applied), acid-resisting, cement-like and adhesive material, applied as a continuous coating to the interior of the shell of the digester, would prevent the acid from acting injuriously thereon. The patentee may have found some new substance possessing the required qualities, but his patent is not for such a discovery. That is not what he claims.

Was it invention to do this? Russell is not the author of the conception that such a material applied to the interior of the shell of a digester under high temperature and pressure will prevent injury to the digester or shell, but his predecessor in the art, Reynolds, was. And more, Reynolds put his conception to practical and successful use in a digester of this description under the conditions named. These substances suggested by the patent in suit for forming the lining are of the same kind and quality, and possess the same attributes or chemical qualities, so far as necessary for the use designed, as did the substance used by Reynolds. But more than this the patent says as already quoted:

"I am aware that cement linings have been employed in various open vessels used for heating acid solutions; but in such open vessels the temperature never exceeds 212°. In digesting wood pulp by the sulphite process the contents of the digester are under very high steam pressure, sometimes as much as one hundred pounds to the square inch, and I believe it to have been unknown until demonstrated by me that a cement lining would stop the passage of the acid solution to the digester shell, notwithstanding this high pressure and temperature."

Here is a statement in express terms that the prior art shows the use of cement linings for the same purpose in open vessels, and their well known adaptability and utility therein are admitted, but, he says, in such prior use the temperature did not exceed 212 degrees, whereas, in digesters for digesting wood pulp by the sulphite process, the contents are under a steam pressure sometimes as high as 100 pounds to the square inch. Then he says, and here if anywhere, is the conception:

"I believe it to have been unknown until demonstrated by me that a cement lining would stop the passage of the acid solution to the digester shell notwithstanding the high pressure and temperature."

This is a confession or concession that the prior art taught, as was the fact, that cement linings under some pressure, and at a temperature of 212 degrees, would stop the passage of the acid solution to the digester shell, and hence a concession that the prior art taught the utility and adaptability and efficiency of cement linings for preventing the acids in wood-pulp digester solutions from reaching the shells. All the Russell patent claims is the discovery that such linings were in fact efficient in closed vessels under a high steam pressure and temperature. In view of the prior art with which he is presumed to have been familiar, and with which he confesses himself to have been

conversant, all he had to do was to try. It was simply a test of how much heat and pressure it would require to force these acids through such cement linings. It was not a new conception or conception of new means, neither was it the use of new means, nor was it the use of old means in a new way to produce the desired result or a new result, or the old result in a better way. It was simply the use of old means in the old way to produce the old result, but under different not new conditions—conditions which differed in degree only. Any person skilled in the art possessing ordinary skill therein, would have apprehended and discovered all that the patent discloses. It would have occurred to any one that such was probably the fact, and merely test-- ing was the proof and the result of the test constituted the discovery. No new quality or function in cement linings of this description was discovered or disclosed. There is no new adaptation, not even a use in a new place or under new conditions except as the conditions vary in pressure and temperature. Was this patentable invention?

I have studied with care and industry the cases where the validity of this patent in suit has been in question, and decided in the affirmative, but am unable to agree with the conclusions reached. They are, to my mind, based on the unfounded assumption that Russell discovered that cementitious linings would resist the acids contained in wood pulp when undergoing the digestive process under high pressure and temperature, and conceived the idea of a continuous coating of acid-resisting material, or that he conceived the idea of a continuous coating of acid-resisting cementitious material as a substitute for the prior lead lining used in the same place for the same purpose.

In American Sulphite Pulp Co. v. Howland Falls Pulp Co., 80 Fed. 395, 399, 25 C. C. A. 500, the Circuit Court of Appeals, First Circuit, reversing Judge Putnam, said that Russell "conceived the idea of a seamless, homogeneous lining, to be composed of materials from which brick, tile, and artificial stone are made, which should be acid- resisting, and so far adhesive that it would attach to the shell and be- come a part of the structural formation, and so far cohesive, expansive, and resilient as to respond to the expensive and retractive force of the iron shell when subjected to the varying conditions of heat and cold, as was necessary in the process of cooking and curing the wood." This patent in suit shows on its face that he did nothing of the sort. He not only confesses therein that he did not, but, as stated, expressly says that what he has discovered is that these old and well-known cementitious acid-resisting linings will resist and prevent ("stop the passage" to use his own language) the penetration "of the acid solu- tion to the digester shell notwithstanding this high pressure and temper- ature" which he has described as existing in a digester, where the sulphite process is used, and which is much greater than the temperature and pressure in the cementitious lined open vessels where these same cementitious linings had been commonly used for the same purpose and under the same conditions except as to degree of heat and pressure. Therefore, as stated, all he pretends to claim is the discovery that such cementitious linings had a greater acid-resisting power than the prior art had practically disclosed. It was not the conception or discovery

of a function or quality but the mere demonstration by experiment that cementitious lining had this greater power of resistance to acid. When he conceded in his patent that cement linings had been employed in various open vessels used for heating acid solutions we may assume they were continuous, homogeneous and adhesive, and therefore when applied "a part of the structural formation" as the lining would be homogeneous unless two or more kinds of cement were used in the same lining which is extremely improbable, and nothing of the kind is suggested, and he knew they were adhesive, for such is the very nature of cement, and it is not probable a cement lining was used which was not adhesive in the vessels referred to by him, and Russell did not suggest even that his cement linings were different in construction, material, mixture, quality, adhesiveness, or mode of construction, from those of the prior art. He did, as stated, point out differences, not of construction, etc., as he claimed none, but in the pressure and heat to which the cement linings of the prior art would be subjected when used in pulp digesters using the sulphite process. The Circuit Court of Appeals, First Circuit, in the case cited evidently had the idea that the patent in suit is for a process when in fact it is nothing of the kind. See page 407, 80 Fed. (25 C. C. A. 500). It is a patent for a structure made of certain materials put together in a certain way to serve a certain purpose. Russell, in this patent, says nothing about a discovery of resiliency, or expansion and contraction, in these cement linings when exposed to heat and cold. Everybody knew cement linings possessed these qualities, and in effect Russell states as much for he says they had been employed in various open vessels used for heating acid solutions, and he, of course, knew that these vessels were sometimes hot and sometimes cold, and he makes no suggestion that the cement linings when used under such conditions cracked or failed to respond to the expansion and contraction of the vessels to which applied and in which used. The idea of means for applying these cement linings to the interior of the digester was not new or novel in any sense. Being plastic and adhesive, the material, or cement, was simply plastered, or spread on in the usual way, the mode used by plasterers for the last 500 years or more, and there is no suggestion of any new, novel, or improved method of applying it. Russell suggests that the thickness of the coat will vary, depending on the size of the digester and the quantity of material contained therein, etc.

I have considered the later case involving the validity of this patent decided by Judge Putnam on application for a preliminary injunction (American Sulphite Pulp Co. v. Burgess Sulphite Fibre Co. [C. C.] 103 Fed. 975), where he felt compelled to follow the Circuit Court of Appeals of his own Circuit, but at the same time he frankly confessed his views as to the validity of the second claim of the patent in suit here, saying: "I say this without undertaking to hold that the second claim has any validity, because I do not think it has." In this conclusion the learned judge was clearly correct whether we consider the patent one for a process or for a mere construction. If the Russell patent be one for a process, as suggested by the Circuit Court of Appeals, First Circuit, in the case cited, then it is for plastering or covering

the interior wall of the shell with an adhesive cementitious acid-resisting substance without seams or joints forming thereby a coating or lining of such thickness as to withstand the acids of the pulp when in process of digestion. This is supplemented in claim 2 by the masonry wall concededly old in the prior art. For the reasons stated, this process was old or patent to any one skilled in the art, as plastered or cement coated cistern walls, rooms in houses and vessels used for heating acid solutions were familiar or well known. Acid-resisting cement linings were the ones used in the vessels for heating acid solutions, hence there was no novel conception in their use. If there was any new conception, it was that such a lining (old), in the new situation; that is, in a pulp digester where the sulphite process was used, and under the increased heat and pressure incident to such situation, would efficiently perform the same function it had performed in the open vessels used for heating acid solutions. That function or office was to resist the penetrative effect of such acids. But that such a lining in such a digester would do this was plainly suggested by the use thereof in the open vessels used for heating acid solutions, and it was only a question of how much heat and pressure the cement lining would stand, and still efficiently resist the penetrative power of the acids in the solution. In the opinion of this court, it was not patentable invention to make tests in a digester and ascertain what the fact in this regard was.

There is no possible resemblance between this case and the Telephone Cases, 126 U. S. 2, 8 Sup. Ct. 778, 31 L. Ed. 863. We might as well say that Bell having discovered the art or process of transferring to, or impressing upon, a continuous current of electricity in a closed circuit, by gradually changing its intensity, the vibrations of air produced by the human voice in articulate speech, in a way to cause the speech to be carried to and received by a listener at a distance on the line of the current, and this being familiar and well known in the art, one who, by mere experiment with Bell's discovery and appliances or apparatus disclosed and pointed out in his patent, ascertains that such speech, under somewhat different surroundings, but still the same in principle and substance, varying only in degree, will be carried to and received by a listener at a still greater distance than Bell had actually caused it to be done, or thought it could be done, is an inventor, and entitled to a patent for his discovery and on the appliances used and pointed out by Bell, in case he should substitute or add more materials, metals, or substances of the same kind and quality than Bell actually mentioned, of which his appliances could be made, Bell not having limited himself as to the materials of which his instrumentalities should be constructed, and the increased distance to which such speech may be carried not being due to such substitution or addition of material. This would be the mere discovery by experiment or use that a given instrumentality will do more work or produce better effects of the same kind than the inventor supposed. To my mind such a discovery is not patentable invention.

In Du Bois v. Kirk, 158 U. S. 58, 15 Sup. Ct. 729, 39 L. Ed. 895, it was decided that the application of an old device to meet a novel exigency and to subserve a new purpose was a useful improvement;

and patentable. But here ·there was no novel exigency. It was an old proposition,· and well· known, that the shell of a digester should be protected from the injurious effects of the acids contained in the mass of pulp and all that· was wanted was a lining that would do this. The old cement linings were not put to a new use, but to a use ·in a new or different place. The old cement linings were not made to subserve or accomplish a new purpose, but only the old purpose for which employed in the open vessels. used for heating acid solutions, that of preventing the acids from reaching to and injuring the shell.

In Western Electric Company v. La Rue, 139 U. S. 601–606, 11 Sup. Ct. 670, 35 L. Ed. 294, it is decided that:

"While the promotion of an old device, such, for instance, as a torsional spring, to a new sphere of action, in which it performs a new function, involves· invention, the transfer or adaptation·of the same device to a similar sphere of action, where it performs substantially the same function, does not - involve invention."

So, here, the transfer or promotion of the cement linings of the prior art was from the open vessels used for heating acid solutions, where the office or function was to keep the acids from the shells of the vessels employed, to digesters or vessels used for heating acid solutions, a similar sphere of action, and there they perform precisely the same office and function. The same result is sought and obtained. Not every improvement in an article or process is invention. The improvement must be the product of original conception. Pearce v. Mulford, 102 U. S. 112–118, 26 L. Ed. 93; Slawson v. Grand Street Railroad, 107 U. S. 649, 2 Sup. Ct. 663, 27 L. Ed. 576; Munson v. N. Y. City, 124 U. S. 606, 8 Sup. Ct. 622, 31 L. Ed. 586.

In Smith v. Nichols, 21· Wall. .(U. S.) 112, 118, 119, 22 L. Ed. 566 quoted and approved in Burt v. Evory, 133 U. S. 349, 358, 10 Sup. Ct. 394, 33 L. Ed. 647, it was expressly decided that:

"A mere carrying forward, a new or more extended application of the original thought, a change only in form, proportions or degree, the substitution of equivalents doing substantially the same thing in the same way, by substantially the same means, with better results, is not such invention as will sustain a patent."

Here we have but a mere carrying forward, a new or more extended application of the conception of the Reynolds patent in using red lead to prevent the acids from reaching the shell and of the conception of the employment of cement linings in open vessels used for heating acid solutions to prevent the acids from reaching. and. injuring the shells of such vessels, to digesters. There is merely a change of degree in the work to be done by the cement linings but the function is the same; the application is the same; the result is the same.

We now come to the question of infringement, assuming that claim 1 of the patent in suit is valid; but I do not think it is. In American Sulphite Pulp Co. v. Howland Falls Pulp Co., 80 Fed. 395, 406, 407, 410, 25 C. C. A. 500 the Circuit Court of Appeals, first Circuit, expressed its idea as to what was covered by and protected by the patent. That court said, when. it came to the statement of what the patent covered:

"In our opinion, the patent is valid, and protection should be commensurate with the invention stated in the claims and the discovery and process described in the specification; and in our view the patent covers homogeneous structural linings composed of adhesive, acid-resisting materials in the nature of cement, which possess the required qualities described in the specification."

In short, to infringe the defendant must use a homogeneous structural lining composed of adhesive, acid-resisting materials in the nature of cement which possess the following qualities, viz.:

"Acid-resisting and capable of being made plastic and adhesive to the shell of the digester, and so compact as to prevent the acid solution from reaching the iron shell in consequence of the high steam-pressure required in practice."

What is meant by a "structural lining" is stated at pages 406 and 407, of 80 Fed. (25 C. C. A. 500) viz.:

"Thus, it would seem to be clear that the inventor intended to cover acid-resisting cementitious mixtures, which could be applied in plastic condition, which would adhere to the outer shell, become a part of it, and so compactly form and harden under the pressure and process of application which he described as to prevent the acid from reaching the iron; and while describing commercial cement as a convenient material, and while he expressed a preference for Portland cement made plastic with water, as to other cementitious mixtures he left the acid-resisting and adhesive qualities to be ascertained by the practical chemist, or other 'person skilled in the art or science to which it' appertained."

And in American Sulphite Pulp Co. v. Burgess Sulphite Fibre Co. (C. C.) 103 Fed. 975, 982, Judge Putnam, with the patent and holding of the Circuit Court of Appeals before him, said:

"Without undertaking to go at length into the nature of the lining of the tenth digester, and reserving my views about that until a final hearing, all I need say with reference to it is that it involves too much doubt on the question of infringement to justify me in issuing an injunction against it. The points of doubt are: First. Whether, after all, the real substance of this construction is not that described by the respondents as a purely, bona fide, composite lining. If it is a purely, bona fide, composite lining, fairly so termed, it certainly does not come within the claims of the patent in suit, because the very essence and gist of those claims is that Russell was able to get rid of everything except the shell of the digester and the lining of cement. That is the very pith of his invention. Second. I have doubts whether this digester really shows anything more than is shown by the Pierredon patent—lava bricks laid in a heavy course of cement; and what is shown in that patent the public has the right to use, independently of any question whether Pierredon saw all the advantage coming from having a heavy cement course under his lava bricks."

That is the pith of the invention and the gist of the claims is the structural lining of acid-resisting cement adhesive to the shell. And this is emphasized by the patent itself which says:

"The thickness of the cement lining when compacted as it is by laying on with a trowel will vary more or less according to the different materials used."

And it is to be applied in a plastic condition and with a trowel or similar instrument as just seen. Hence, if this is a process patent this application is made an essential part of the process, for the shell is to have "a continuous lining or coat, B, of cement, as described, applied to the interior of the said shell." And applied means applied substantially in the mode and manner described so as to be not only adhesive

to the shell but "compacted as it is by laying on with a trowel" and hence the compacting is an essential part of the process described and claimed. And "compacted" means "closely and firmly united, as the parts or particles of solid bodies; having the parts or particles pressed or packed together; solid, dense." Cent. Dict. "Compact" means "To thrust, drive, pack, or press closely together." Something must be done to this cement when applied to compact it, press it together. This is essential to the process, and made so by the claims and specifications which must be read together.

What has defendant done? It has lined its digesters in the following manner: First. It raises a section of brick or tile wall a few inches distant from the shell of the digester laid in cement mortar, using Portland, or any other acid-resisting cement suitable for the purpose and also using acid-resisting brick or tile. Second. Back of this, and between the wall and shell, it pours in grout, or a thick liquid composed of fluid and acid-resisting cement dissolved, until the space is nearly filled. Third. It then presses down into this liquid mass of grout as many brick or pieces of brick as it can, the one on top of another and which may or may not touch the shell in places. Fourth. It then raises another section of wall on top of the first, and then pours in grout as before, and then presses into this brick as before. This operation is repeated until the top of the digester is reached. In the end, it has a composite grouted brick wall composed of brick and cement adjacent and contiguous to the shell of the digester. The cement grout hardens, as is well known, and as always has been known it will do, and adheres to the shell as from its very nature it will and must, but nothing is done by defendant to make it adhere or to compact it. It is not applied with a trowel or any other instrument or compacted or pressed together in any way or manner. It is simply left to harden, as in its very nature it will without any pressure or compression whatever. This is a mere filling in of the space, old in the art (Reynolds patent), between the brick or masonry wall, old in the art (Mitscherlich patent) with grout or liquid cement and brick or tile. It is not the process of the patent in suit. It is not the structure of the patent in suit. It is the use of the old brick wall which, old in the art, he had the right to use, and of grout composed of acid-resisting cement, which old in this, or in similar and analogous arts, he had the right to use, for filling the open space described in the patent in suit as existing in the prior art, in place and stead of filling such space with fluid, such as air, water, or steam under pressure, as it had a perfect right to do. Grout composed of water and cement, old in the art, is a fluid. All fluids have more or less of solids, and this patent gives complainant no monopoly of brick walls, or of grout or its use, or composite walls in making digester linings. It may be that this wall does as well as complainant's lining; that it serves the same purpose in a digester, that of protecting the shell from the acids but it is not the equivalent of the method or process or structure described in complainant's patent. Even if between the brick and shell there may be found a continuous, homogeneous body of cement, it is incident to the construction of a grouted wall of masonry familiar

in the art for centuries. Such body of cement, if found, is not "applied" to the shell, nor is it "compacted" in any mode or manner. With similar conditions existing, and a similar lining before him, Judge Putnam refused a preliminary injunction. I coincide with his views as to infringement and hold, first, that the claims of the patent in suit in view of the prior art fail to disclose patentable invention; and, second, that conceding claim 1 to be valid no infringement by defendant has been shown. Again, defendant's method, mode, or process of construction is clearly differentiated from complainant's; and, as Russell was, in any event, a mere improver, not a pioneer, the charge of infringement is not sustained. Cimiotti Unhairing Co. v. American Fur Refining Co., 198 U. S. 399, 414, 25 Sup. Ct. 697, 49 L. Ed. 1100; Kokomo Fence Machine Co. v. Kitselman, 189 U. S. 8, 23 Sup. Ct. 521, 47 L. Ed. 689; Computing Scale Co. of America v. Automatic Scale Co. (Feb. 25, 1907) 204 U. S. 609, 27 Sup. Ct. 307, 51 L. Ed. ——.

There will be a decree dismissing the bill of complaint, with costs.